Good morning, your honors. May it please the court, my name is Richard Wooster of Cram Johnson Wooster McLaughlin Tacoma, Washington. Here on behalf of Mr. Dalton I'd like to reserve four minutes for rebuttal. Mr. Dalton was a 16-year employee as a registered nurse for the Department of Corrections working at McNeil Island Correctional Center here in Washington State. He had brought a number of issues regarding public concern, quality of health care for both the staff and the inmates at the facility, and he asserts that he was retaliated against. This is a review of a summary judgment motion. The standard of review is de novo. All reasonable inferences of fact should be interpreted in favor of Mr. Dalton, the non-moving party. We have issues regarding freedom of speech claims, reliance on hearsay and inadmissible evidence, a due process claim that was dismissed, state law claims that were dismissed, and tangentially the issue of qualified immunity. Ng v. Cooley, which didn't have the cite in the brief because it wasn't available at the time, 552 F. 3rd 1062, says this court applies a sequential five-step process for evaluating free speech retaliation claims. Whether the plaintiff spoke in the matter of public concern, whether the plaintiff spoke as a private citizen or a public employee, and whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action. Now those are areas that the plaintiff bears the burden of proof upon, and then the defendant, if the plaintiff carries those issues, the defendant comes forward and argues whether the state had an adequate justification for treating the employee differently from other members of the general public, essentially a Pickering balancing test. This issue really drops out of this case because the defendants did not assert there was a reason for treating Mr. Dalton differently than other members of the public on the issues upon which he was speaking. They're really suggesting that, they're really fighting about the first issues, correct? Pretty much, yes. They haven't talked about the Pickering issue. They have not really, and they have also asserted the fifth issue, which is the Mount Healthy argument, which, well, even if all this factored in, we would have reached the same result anyway. And the court looked at this issue, Magistrate Judge Strombaum, and she found that Mr. Dalton's speech before the risk management task force was protected speech. And in that, he was discussing incompetent managers, protection of incompetence, lying by managers, retaliation for bringing issues forward, meeting with Ms. Gastrich, who was Mr. Lehman's risk manager, that was ignored, inmates being injured, an employee who was killed, altering sworn statements by prison officials, officials engaging in inappropriate actions, being laterally transferred, and that management needs to start doing their job and looking at the issues that are going on. And the court properly found that all of those issues were matters of public concern. Mr. Dalton followed up his testimony with a letter to Sterling and Associates, which was the company that was putting on the task force on behalf of the state, in which he provided much greater detail of the issues that he was talking about. Now, after Mr. Dalton testified, Mr. Lehman made inquiry regarding Mr. Dalton's status at McNeil, who he was, where he was. Ms. Payne denies that she received that phone call, although she was the superintendent of the McNeil Island facility and logically the person that Mr. Lehman would call. And Mr. Lehman believes that is who he called. The court also looked at other acts of speech by Mr. Dalton and essentially tossed those out under the Garcetti analysis. The Garcetti changed the landscape of First Amendment speech, and it's being broadly interpreted in some areas. And the Ninth Circuit has taken a more pragmatic approach of looking at the Garcetti analysis. And in Posey's case, Garcetti involves mixed questions of fact and law. And you've got to look at what was the employee actually being retained to do. In this instance, Mr. Dalton was a registered nurse. He was not being hired as a nurse manager. He was not being hired as a person to fix administrative or called upon to bring forward issues where problems were happening and they weren't being fixed. And that's exactly what he was doing. And the court disregarded all of that, saying, well, it all came to his knowledge through the course and scope of his job. Therefore, under Garcetti, it's all out, and I'm not going to consider that as protected speech. Included in that was his email, which this is a very significant email. It's ER643, which is his email that he got from his supervisor in response to his statement, I'm being told not to call physicians during the night unless it is an emergency situation. I am concerned that that is a denial of care. And the superintendent, or rather his supervisor responded and said, no, I didn't tell you not to call the physicians during the night. I told you to wait until a decent hour. And so that's one act of speech that the court said, well, that's just related to his issues as a nurse and therefore that is not protected speech under Garcetti. There were several emails regarding ongoing staff failures to communicate information to the physician about an emergency, about an inmate. These are found at ER682, 684, 697, 98, 706, 708, 709. And these are situations where they would call and say, man down. He would ask, you know, what, I need more information. And they just said, man down. They wouldn't provide him the information that he needed to know what to bring to go from his location in the health care center to where the man is down. And he would repeatedly bring those issues to the attention of his supervisors that he was not being provided adequate information. You don't think that when he's hired as a nurse that there's an implication that even though he's not a spokesman or anything, there's an implication that when something is preventing him from doing his job, he isn't authorized as part of his job to ask his superiors about it? Well, I think he is authorized as part of his job to ask his superiors about it. But what he was doing goes beyond simply asking his superiors about it. He was informing his superiors repeatedly that this is an issue that's being fixed and corrected, and it's posing a hazard for the patient's... Does that take it out of Garcetti? I think that it does take it out of their study, because it comes in more like the Marable case, which was a very... He said Garcetti, not their study. Oh, I'm sorry. I thought he did say Garcetti. It does take it out of Garcetti, and it brings into the realm of the Marable v. Nitschman case, which involved the Washington State ferry worker, who was aware of situations that were impacting the operation of the ferry service and what he deemed to be inappropriate and unethical behavior on the part of managers. And this court said in that case that he wasn't being hired to supervise these managers. He was hired to be a ferry boat engineer. And in that case, Garcetti did not apply. Are we really, however, concerned about, and I don't mean to interrupt your argument in that regard, but are we really concerned about whether his information, testimony, if you will, to the risk management task force, his letter to the various public officials, if that is protected speech, why we have a summary judgment here? Isn't that what we're really worried about? Well, I think that's true, but I wanted to talk about all of the other issues. I mean, you get through this summary judgment if you even get to that, don't you? I mean, if you make it that the fact that this risk management task force and the letter to the public officials was something that was a substantial motivating factor for the termination, at that point we have to send it back to make that determination. So if you make it on that particular issue, you've really made it to the second point, which is where you're really going, aren't you, haven't you? You don't really need the e-mails that are about the performance of other people's duties or how the prison was going or all of that. If you go with risk management task force, you've made the appeal, haven't you? Well, I've made the first step. Now, what the magistrate judge determined was that we had an insufficient link-up between Mr. Dalton's testimony before. But we have in the record, don't we, that Mr. Lehman, who gave the final approval to the termination, was aware of the testimony. So on summary judgment, that's pretty good, isn't it? That's very good. And frankly, I was stunned when summary judgment was granted. What we also have to do is look at the Kaiser. And there was an adverse employment decision within approximately one year of the testimony, correct? That is correct. In fact, there were numerous adverse employment actions. As a result of that, the argument would be that as a result of the testimony before the risk management task force and the letters written to the officials, your client received adverse employment action. Yes, Your Honor. And there seems to be some evidence that Mr. Lehman may have known about the testimony. He seems to have known. He was on the panel. He was present when the testimony was given. He knew about it. And that he took part in the termination decision, I think. Yes, he did. He granted the final approval. Now, once you've done all of that, are you saying there's something else you have to show to perfect your free speech case upon the testimony before the risk management task force? Well, we have to show, well, essentially you pointed out that the adverse action occurred within a year of that testimony. And under those cases, it implies that that's sufficient in which the court could impute that retaliation motivated the adverse employment action. So we're there. The Department of Corrections probably said, well, yeah, we terminated him, but it wasn't because of that testimony. It was because of all of this other stuff. And he was really an incompetent worker. And we terminated him. That'll probably be their story. Is that right? That's their allegation. Yes. And you're going to have to prove, no, they terminated him because of that testimony before the risk management whatever task force. Correct. And we can show that through the proximity in time. We can show that the employer expressed opposition to the employer's speech, either to the employee or others. Proximity in time, I suppose, would raise a factual issue because the defense is going to say, my God, it wasn't a year later that he was terminated. If they wanted to terminate him for that, they would have terminated him within a couple of weeks or something like that. Within a year. That's a question of fact, I guess, for the jury, you would argue? I would argue that. And hybrid versus Heister Corporation, I believe it is, indicates building a record can support inferences of retaliation. And that clearly was going on. I have a minute and 30 left. I'd like to save it for rebuttal, if I may. All right. Thank you. You can always tell the lawyers who have been here before, because they know that thing moves up and down. I practiced yesterday, Your Honor, but I tried. You came over here before to practice. Good. May it please the Court. My name is Lisa Sutton, and I'm senior counsel with the Washington State Attorney General's Office, and I'm here today on behalf of the Department of Health to address the first amendment claim. The first amendment claim is primarily directed at the First Amendment claim to affirm dismissal of the First Amendment claim brought by Mr. Dalton. The backdrop for this case arises out of the way that health care was delivered at McNeil Correctional Facility, which housed approximately 400 inmates, state correctional facility. In 1999, the Department of Health audited the Corrections Medical Center and found a number of serious deficiencies. At that point, then-Correctional Secretary Joseph Lehman, a defendant here, agreed to fundamental changes in the way health care was delivered. Between 1999 and 2004, the Department of Health McNeil Facility went from 99 serious deficiencies in medical care down to zero, which is phenomenal. What Secretary Lehman did was to hire Superintendent Payne, who is a defendant, to lead that health care reform. She, in turn, hired health care manager Robinson. The defendants were brought in to fix the very problems that were addressed in the Department of Health audit. It was against this backdrop that the district court found that there was basically Mr. Dalton failed to meet his burden of proof that any protected speech that he engaged in at the Risk Management Task Force and his follow-up letter in May 2001, which we do not dispute. We acknowledge that that was protected speech to the district court. But what the district court found was he failed to link that up, and he failed to prove that that protected speech was a substantial or motivating factor in his dismissal. And the reason why the district court came to that conclusion was that even though Secretary Lehman, as a member of the task force, was present, he heard the testimony. That's undisputed. And if I correct the record that was stated by Mr. Wooster at ER 808-10, that is where Mr. Lehman was asked in deposition, did you talk to anybody about what you heard Mr. Dalton testify to? He said, well, I asked where he worked. Did you talk to anybody else? And this, the record is clear on. He said, well, I don't know. I don't recall. I might have talked to Superintendent Payne, but if I did talk to anybody, logically, I would have talked to the Deputy Secretary. That is what this record is. Secretary Lehman also affirmatively denied taking any other action with respect to Mr. Dalton as a nurse who was working at a different site at McNeil. Secretary Lehman denied taking any other action other than to approve the termination decision that was made by Superintendent Payne. And Secretary Lehman did that in his capacity as, of course, the overall superintendent. In the face of that affirmative denial, the district court found that Mr. Dalton did not rebut that evidence. He did not come back and show that Secretary Lehman had anything to do with any of the other matters that he brought forth with the court. And significantly also, with respect to the other two defendants, Payne and Robinson, they affirmatively, both of them, denied knowing that the task force occurred and knowing that there was testimony that Mr. Dalton gave at the task force or that he wrote a follow-up letter. And in fact, the district court, in her ruling, noted that that follow-up letter was not copied to either Superintendent Payne or to healthcare manager Robinson. And in the face of that denial, which Mr. Dalton did not rebut, she admitted that she had no intention of taking any action other than to approve the termination decision that was made by Mr. Dalton. And I'm not going to interrupt you. I don't mean to interrupt you, but it seems to me that your facts are facts which can be submitted to the jury, which would go your particular, the way you would particularly like this case to go. But here we have a motion for summary judgment. And on a motion for summary judgment, I'm to pull out of this particular matter. And there's no question he testified before the Risk Management Committee, correct? That's true. And there's no testimony that Lehman was right there and heard his testimony and thereafter asked somebody where he worked? That's correct, Your Honor. And there's no question that Dalton, when Dalton returned to work the next day, that the associate superintendent commented, our favorite nurse? That's in the record, isn't it? That's in the record, yes. And then Lehman called Payne to inquire about Dalton. That testimony is ambiguous, and Superintendent Payne denied it. He said he couldn't recall. At ER 10, it suggests that Payne denied having, but there is information in the record that he did call Payne. Lehman, what he testified to at ER 808 to 10, and this has been misconstrued in the record, which is why I think it's important here to correct. He said, I don't recall speaking to anyone. I may have called Superintendent Payne, but if I talked to anyone, I likely would have talked to the deputy secretary. Okay, and then within six months of him giving testimony at the prison medical facilities, then Dalton's immediate supervisor, Whitaker, reports him to the State Department of Health. That is true, and the reason that that report was made was due to how Mr. Dalton handled a cardiac patient. Well, I understand, but I'm just trying to suggest as to Dalton's best case. Then within six months, Dalton received two separate letters of reprimand. Within eight months, Dalton receives an employee conduct report regarding his handling of the acute dental patient is filed. Twelve months after the testimony, he was informed of the preliminary decision to terminate him. Thirteen months, he's terminated, and Lehman says, yeah, you're out the door. Now, on that record, can I say, on summary judgment, no way a plaintiff can prove his case. What the district court did, and I think appropriately so, was to say that Mr. Dalton did not create a causal link between the task force testimony and the actions that were subsequently taken. But there's no way that Mr. Dalton's going to be able to have somebody come in and say, that's exactly the reason I did it. Nobody's going to say that. All he has to do is he has to do it by circumstantial evidence. That's why I put all that evidence in front of you. With that circumstantial evidence, how can I suggest that on summary judgment, one cannot say that was a substantial factor? The first of the complaints about Mr. Dalton that led to the reprimand over the cardiac patient, the urinal as a drink container, and how he treated the dental patient in February of 2002, were matters brought forward by the individual defendants. But none of those matters were. And that's the link that Mr. Dalton was missing. The matters involving his egregious conduct and treatment of the inmate patients and his failure to do what his job was as the night shift nurse was brought forward by his co-workers, those who worked with him. They had no knowledge, nor is there anything in the record that suggests that they had knowledge that he had brought forth previously in May of 2001 testimony to the risk management task force. And in fact, his immediate supervisor, Nurse Whitaker, was asked, did you know that Mr. Dalton had testified before a task force? Did you know what he said? She said, no, that's at ER 803. Similarly, one step up, the healthcare manager, Chapala, he was asked, did you know that Mr. Dalton had testified to the risk management task force, ER 791 to 792? He said, no. So there's no link between the task force testimony, even if Secretary Lehman heard it, and the events that took place later as a result of his unprofessional conduct. Those complaints about his behavior were brought forward by people that had no relationship at all in this record to what Mr. Dalton said to the task force. And the two Department of Health reports that were made, and yes, they were made by healthcare manager Robinson, as a result of the concerns brought forward by people that were working with Nurse Dalton that were concerned about Ms. Dalton's, Mr. Dalton's unprofessional conduct. As a result of these complaints, she made two mandatory complaints to the Department of Health, one in December, and subsequently one in April. And the reason she did that is she felt, healthcare manager Robinson, that these matters were serious enough that it showed a pattern of basically nursing care that fell below the standard of care, and she wanted Department of Health to investigate. As to the first of the three serious incidences that led ultimately to dismissal, the cardiac patient in November of 2001. The reason that this is critical is Mr. Dalton, after he was dismissed, he admitted that his conduct was unprofessional. And his conduct on that day, if proven, if they'd actually gone to hearing, would have violated the Nurse Practices Act. So there's no dispute about the events. There's no dispute here, material genuine dispute of fact, as to who reported Mr. Dalton. It wasn't healthcare manager Robinson, it wasn't superintendent Payne five levels higher, it wasn't Joe Layman who was down at headquarters in Olympia, it was those who worked with Mr. Dalton. And that's what the district court looked carefully at, is this a case where the matters that Mr. Dalton was being held professionally accountable for, under the guise of the healthcare reform that we are holding employees accountable now, did Mr. Dalton fall short of that? And the answer was yes, his conduct directly impacted patient care. Are we really though, really looking at, is there more than a scintilla of evidence to suggest that Dalton was disciplined because of his risk management testimony? Isn't that what we're really looking at? If there's more than a scintilla, we can't give summary judgment. We can't give summary judgment on this record as to the reasons why the defendants did what they did, and as to the reasons why Mr. Dalton's dismissal was appropriate. It had nothing to do with his protected speech. The district court also correctly found that the other issues that Mr. Dalton raised were directly related to his job duties as a night shift nurse, and those are summarized best, I think, in footnote 36 of our brief. Because the Department of Health investigated how Mr. Dalton, or how he failed to treat appropriately, give informed consent to the cardiac patient, how he refused to call the on-call doctor and inform him of the patient's change in status. When the Department of Health evaluated that, the investigator, Linda Patterson, had no trouble determining that Mr. Dalton, there were some serious concerns about his conduct, which is why she forwarded her findings to the overall Nurse Care Quality Commission. And, in fact, when the second complaint came in, in April of 2002, and the procedures were already starting to occur, leading to termination for Mr. Dalton, that when the Department of Health investigator looked at the second matter, she was concerned enough about, and it's in the record, that if it was true, again, it would show a pattern of deficient nursing care. And when the district court looked at this record and said, what are the other issues that Mr. Dalton complained about? Are those related to his job or not? She concluded that they were related to his job as the night shift nurse. It was his responsibility, because he was the only nurse on duty, there were no medical doctors or dental staff at night at the facility. So when a patient declared an emergency, as the dental patient did in February of 2002, and came down to see Nurse Care Quality Commission, Nurse Dalton said, I'd like pain relief. He had an abscessed tooth. He was in severe pain. Those facts are not in dispute. What did Mr. Dalton do? He sent him back to his room with an ice pack. He did not pick up the phone, as he had a duty to do, and that's what the record clearly shows. He could have asked for pain relief. That's what the patient wanted. He sent the patient back home. That is the third of the three incidences that led Superintendent Payne on the recommendation of the Department of Health to determine, given the pattern of history that Mr. Dalton had even before these three incidences, is this a pattern of behavior that we've tried to correct and were unable to? Is he jeopardizing patient care? Does he show a lack of empathy for patients? And on this record, Superintendent Payne, after conducting a pre-disciplinary hearing where Mr. Dalton was represented by his union representative and could provide an excuse, and his excuse continued to be, I don't know what an emergency is, so don't hold me accountable, I decide whether or not to call the on-call doctor based on who's on call that night. But I didn't know who was on call in February of 2001, but I didn't call the doctor anyway. And I object to the Department of Health's order that was done several years earlier that a nurse no longer has a standing order because of the health care reform that needed to occur. The Department of Health had ordered the Department of Corrections to stop using standing orders. And what did that mean? That meant the nurses had to pick up the phone to call the doctor for pain relief. And that was what Mr. Dalton continued to object to. And so on this record, the district court found that his other concerns related to what do we do in an emergency, what kind of emergency, what happens if it's not a true emergency and I call, am I going to get in trouble if I'm going to be chastised, she found that all those were matters that clearly related to his job as a licensed registered nurse. And that was appropriate on this record. Thank you very much for your argument, counsel. Your Honor, counsel cited supplemental authority of Scott v. Harris for a petition that when a record could present no one but one conclusion, summary judgment should be granted. That was a case involving a videotaped car chase. And I would submit it's ironic that that's argued here because Robinson waited until the videotape had been submitted. And it had been destroyed of Mr. Dalton's interaction with the patient for which she reported him to the Department of Health. And reported him to the Department of Health long before she notified him there was a problem with care. The Department of Health found no finding of misconduct for his interaction with the dental care patient. I would submit that the record shows evidence that the employer opposed speech, that the employer's speech was not correct. That neither state agrees that it was adverse action or false and pretextual. You look at the way they claim that these policies didn't exist, had been revoked, nobody knew they'd been revoked. She refused to consider the e-mail saying call it a decent hour because it wasn't signed. Nobody else said it was signed. I would submit that there is more than ample evidence in this record to send it back for trial. And also the issue of due process, which kind of went out with the bathwater when this case was done. It was never issued. The court looked at that as simply a lottermill issue and ignored the substantive due process issue that was being asserted based on the biased decision maker that was acting. Thank you very much for your argument. The case of Dalton v. Washington State Department of Corrections, case 08-35097 is submitted.
judges: Canby, Thompson, Smith N. R.